# CONTINUATION IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Dustin Hurt, being first duly sworn, depose and state as follows:

1. I have been employed as a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), United States Department of Justice, since October of 2018. I am currently assigned to the Detroit Field Division, Lansing Satellite Office. Prior to being assigned to the Lansing Office, I was assigned to the ATF Flint Field Office. I am a graduate of the Criminal Investigator Training Program and the ATF Special Agent Basic Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. Before working for the ATF, I was employed by the Michigan Department of State Police (MSP) for approximately seven years. Before working for the MSP, I was a local police officer for the Grand Ledge, Michigan, Police Department for approximately three years. I held numerous positions with the MSP, including Detective Sergeant in the Polygraph Unit and Task Force Officer with the FBI's Safe Streets Task Force (Flint, MI). During my employment with ATF and MSP, I have conducted or participated in numerous criminal investigations focused on firearms, armed drug trafficking, violent crime, criminal street gangs, and other violations of federal law. The facts in this Continuation come from my personal observations, training, experience, and information obtained from other witnesses.

2. The items of property to be searched are (1) one green Apple iPhone in a pink case seized from Teirra HILL on June 30, 2026, (2) one blue Apple iPhone in a clear case seized from Teirra HILL on June 30, 2026, (3) one light blue Apple

iPhone in a clear case seized from Walter Allen VAUGHN on June 30, 2026 (collectively "the **Subject Cellphones**"). The **Subject Cellphones** are more particularly described and pictured in Attachment A of this continuation. The **Subject Cellphones** are currently located at the ATF Lansing Field Office.

3. Because this continuation is being submitted for the limited purpose of establishing probable cause, I have not included every detail of the investigation. Rather, I have set forth only those facts necessary to establish probable cause to search the **Subject Cellphones**.

4. The applied-for warrant would authorize the forensic examination of the **Subject Cellphones** for the purpose of identifying electronically stored data particularly described in Attachment B.

5. The **Subject Cellphones** came into the lawful possession of the ATF Lansing Field Office through the arrests of HILL and VAUGHN on arrest warrants for federal criminal charges. In my training and experience, I know that the devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **Subject Cellphones** first came into the possession of the ATF Lansing Field Office.

6. Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically 21 U.S.C. § 841(a) (distribution of and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy to commit the same) (collectively the "**Subject Offenses**"), will be found on the **Subject Cellphones**.

## SUMMARY OF INVESTIGATION

7. This Application requests the issuance of a warrant to examine the **Subject Cellphones,** two of which were seized on June 30, 2026, from HILL and one of which was seized from VAUGHN during their arrests on that same day.

8. I know that individuals who distribute controlled substances utilize cell phones to acquire, document possession of, and distribute controlled substances utilizing text messaging, photographs/videos, calls, emails, social media, etc.

9. On June 23, 2026, a criminal complaint and arrest warrant were issued for HILL (W.D. Michigan Case No. 1:26-MJ-261) which charged her with Possession with Intent to Distribute Controlled Substances on or about February 3, 2026, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). That complaint provided the following facts:

a) On February 3, 2026, law enforcement received a tip from a confidential ATF source indicating that HILL was traveling from Chicago, Illinois, to Lansing, Michigan, while transporting controlled substances.

b) Officers subsequently observed HILL driving a Hyundai Elantra as she exited the highway in Lansing. She was the sole occupant of the vehicle. While traveling near Pennsylvania Avenue and Fayette Street, officers saw her tailgating other vehicles and repeatedly honking her horn, which is conduct contrary to Michigan law (MCL 257.643).

c) Troopers followed HILL as she continued driving, and, as she pulled into her driveway of her residence on Pontiac Street, they initiated a traffic for the observed traffic violations.

d) Upon contact with officers, HILL did not comply with repeated commands to exit the vehicle. Instead, she reached for her phone and repeatedly reached under her seat. A trooper had to make contact with HILL and physically restrain her hands to prevent her from accessing the area beneath the seat.

e) After eventually exiting the vehicle, HILL pressed the horn again, which, based on the officers' observations, appeared to be an attempt to alert individuals inside the residence to the presence of law enforcement. She was detained due to her non-compliant behavior.

f) A canine handler with the Michigan State Police was present on the scene with a police dog that was trained and certified in narcotics detection. That Trooper deployed his canine to conduct an open-air sniff of the vehicle. The canine alerted to the presence of narcotics. Based on the positive alert, as well as the tip concerning drug trafficking, troopers searched the vehicle.

g) In the trunk, troopers located a black plastic bag containing two large zip-top bags of suspected methamphetamine weighing a total of approximately 930.37 grams, along with a corner-tie bag containing

approximately 26.10 grams of suspected heroin. Officers determined controlled substance type using field testing equipment.

h) When one officer located the narcotics, HILL attempted to walk away from the patrol vehicle toward the street. Another trooper stopped her, and she resisted by pulling away and yelling.

i) Based on the affiant's training and experience, 930.37 grams of suspected methamphetamine is not a personal use amount. A mere user of methamphetamine would typically purchase the drug in amounts of 2 grams or less, with a common user dose varying from about 0.1 to 0.5 grams.

j) Consequently, 930.37 grams of methamphetamine indicates the intent to distribute it. The same is true concerning the suspected heroin, which is sold in roughly the same mere user quantities of 2 grams or less, with a common user dose varying from about .01 to 0.5 grams. Moreover, the corner-tie bag containing 26.10 grams of heroin is a distribution amount of heroin—an individual would not use that quantity for personal consumption.

10. On June 30, 2026, Michigan State Police and the Tri-County Metro Narcotics Team ("TCM") conducted a traffic stop of HILL and arrested her in connection with the criminal complaint. During the arrest, officers seized two of the **Subject Cellphones** that were in HILL's possession. HILL was the sole occupant of the vehicle—a blue Chevrolet Equinox bearing Illinois registration DX16018.

Based on the arrest warrant and probable cause, officers searched the vehicle and located approximately 926.73 grams of crystal methamphetamine, 63.28 grams of cocaine, and a large container of suspected Psylocibin mushrooms. TCM Det. Stoltzfus conducted TruNarc scans of the suspected methamphetamine and cocaine. Both substances tested positive for their respective substances.

11. On June 24, 2026, a criminal complaint and arrest warrant were issued for VAUGHN (W.D. Michigan Case No. 1:26-MJ-262) which charged him with Possession with Intent to Distribute Methamphetamine on or about January 30, 2026, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). That complaint provided the following facts:

a) On January 30, 2026, an officer with the Eaton County Sheriff's Department (ECSD) observed a white Hyundai Elantra traveling on Waverly Road in Lansing, Michigan.

b) The officer noted that the vehicle's license plate was unreadable due to being covered in dirt. The officer also observed the vehicle cross the center line into the adjacent lane.

c) Based on these observed traffic violations, ECSD officers initiated a traffic stop. The vehicle, driven by VAUGHN, came to a stop. VAUGHN was the sole occupant.

d) An officer approached the passenger side of the vehicle and instructed VAUGHN to roll down the passenger window. Although VAUGHN appeared to attempt to do so, the window did not open. The officer then

directed VAUGHN to unlock the vehicle so the officer could open the passenger door to speak with him. VAUGHN refused to comply.

e) Officers repeated commands for several minutes, including warnings that VAUGHN would be arrested if he failed to obey lawful instructions. VAUGHN continued to refuse to open either the window or the door.

f) After multiple warnings, officers ordered VAUGHN to exit the vehicle or face being forcibly removed. VAUGHN ultimately did so, and officers placed him under arrest for resisting and obstructing.

g) After he was detained, an officer conducted a search of VAUGHN's person. During this search, VAUGHN kept his left hand close to his body and then inserted that hand into his left jacket or pants pocket.

h) The officer physically pulled VAUGHN's hand away and observed that he was tightly clenching an item in his closed fist. A second officer, who had been searching the vehicle for registration documents, came to assist.

i) Due to VAUGHN's resistance, officers brought him to the ground and attempted to remove the item from his fist. VAUGHN continued to resist but officers eventually retrieved a plastic baggie from his hand.

j) The item recovered from VAUGHN's hand contained approximately 58 grams of a substance that field-tested positive for methamphetamine.

The methamphetamine was found to be packaged in two separate baggies.

k) Subsequent laboratory testing by the Drug Enforcement Administration (DEA) determined that the substance contained 53.6 grams of actual methamphetamine, with a variance of +/- 3.6 grams.

l) Based on the affiant's training and experience, 53.6 grams of actual methamphetamine is not a personal use amount. A mere user of methamphetamine would typically purchase the drug in amounts of 2 grams or less, with a common user dose varying from about 0.1 to 0.5 grams.

m) Consequently, 53.6 grams of methamphetamine indicates the intent to distribute it for use by others. The combination of that quantity of methamphetamine, along with the packaging into two separate bags, indicates that VAUGHN possessed the methamphetamine with the intent to distribute it contrary to federal law.

n) Officers also recovered $520 in U.S. currency from VAUGHN. Large sums of cash are commonly associated with drug dealing.

12. On June 30, 2026, TCM Detectives went to the area of 413 South Cedar Street Lansing, MI, a known halfway house. VAUGHN was located and arrested near that address in connection with the criminal complaint, while on a bicycle. VAUGHN had his cell phone (a **Subject Device**) and $2,200.77 in his pants

pocket, mostly in $20 denominations, which is indicative of controlled substance distribution.

13. Both VAUGHN and HILL were taken into the custody of the United States Marshal's Service and had their initial appearances on June 30, 2026.

14. On July 14, 2026, a federal grand jury sitting in the Western District of Michigan returned an indictment (Case No. 1:26-CR-00065) charging VAUGHN and HILL. The indictment charges:

1) Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances (VAUGHN and HILL), 21 U.S.C. § 846;
2) Distribution of Controlled Substances (VAUGHN and HILL), 21 U.S.C. § 841(a)(1);
3) Distribution of Controlled Substances (VAUGHN and HILL), 21 U.S.C. § 841(a)(1);
4) Felon in Possession of a Firearm (VAUGHN), 18 U.S.C. § 922(g)(1);
5) Possession with Intent to Distribute Controlled Substances ("PWID") (VAUGHN), 21 U.S.C. § 841(a)(1);
6) PWID (HILL), 21 U.S.C. § 841(a)(1);
7) PWID (VAUGHN and HILL), 21 U.S.C. § 841(a)(1); and
8) PWID (HILL), 21 U.S.C. § 841(a)(1).

15) Based on the information set forth, the probable cause found by the grand jury for the counts charged in the indictment, physical evidence of trafficking that was seized and purchased during the pre-indictment investigation, and my knowledge, training and experience in the distribution of controlled substances investigations, I respectfully submit there is probable cause to believe additional evidence of VAUGHN and HILL trafficking narcotics and their conspiracy to do the

same will be found in electronic format on the **Subject Cellphones**. Specifically, based on the totality of the circumstances, there is probable cause to believe that the **Subject Cellphones** will contain contact lists, telephone logs, photographs, messages, and other data that relate to the illegal possession and distribution of narcotics.

16) The three **Subject Cellphones** are in storage at the ATF Lansing Satellite Office in Lansing, Michigan. The **Subject Cellphones** have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as it was when the Subject Device was first seized by law enforcement on June 30, 2026.

**TECHNICAL TERMS**

17. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These

capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's

latitude, longitude, and sometimes altitude with a high level of precision.

c. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every device attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that device may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some devices have static—that is, long-term—IP addresses, while other devices have dynamic—that is, frequently changed—IP addresses.

d. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

18. Based on my training, experience, and research, I know that the **Subject Cellphones** have capabilities that allow them to serve as a wireless telephone, GPS locator, and Internet-connect browsing device, with assigned IP addresses. In my training and experience, examining data stored on devices of this

type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

19. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20. There is probable cause to believe that things that were once stored on the **Subject Cellphones** may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that smartphone files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is

not currently being used by an active file—for long periods of time before they are overwritten. In addition, a smartphone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, smartphone storage media—in particular, smartphones' internal storage—contain electronic evidence of how a smartphone has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Smartphone users often do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

21. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Cellphones** were used, the

purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Cellphones** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Smartphone systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to

investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. I know that when an individual uses an electronic device to defraud victims, the individual's electronic device will generally serve both as an instrumentality for committing wire fraud, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

22. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Cellphones** consistent with the warrant. The examination may require

authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

23. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**REQUEST FOR AUTHORIZATION TO UNLOCK DEVICES**

24. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

25. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

26. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

27. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

28. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is

particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

29. The passcode or password that would unlock the Subject Cellphones under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the Subject Cellphones, making the use of biometric features necessary to the execution of the search authorized by this warrant.

30. In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.

31. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual reasonably believed by law enforcement to be a user of

the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

32. Based on the above information, there is probable cause to believe that evidence, contraband, fruits of crimes, and other items related to the **Subject Offenses** are present on the items described in Attachment A. Accordingly, I respectfully request that this Court issue a search warrant for the listed items, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, which constitute evidence, contraband, fruits, and other items related the **Subject Offenses**.